Jonathan J. Faria P.C. (SBN 274019)
9854 National Blvd. #1079
Los Angeles, CA  90067
Telephone:  (323) 539-3422
jon@fariapc.com

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| I.P., a minor, by and through her father, JASON PACK, <br><br> Plaintiff, <br><br> vs. <br><br> MICHAEL WEST, GETTY GEORGE, COREY KLEVEN and RIVERSIDE UNIFIED SCHOOL DISTRICT, <br><br> Defendants. | Case No. 5:22-CV-1920 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff I.P.,[1] a minor, by and through her father and guardian ad litem, Jason Pack, alleges as follows:

## **INTRODUCTION**

1.      The Riverside Unified School District (the "District") has a long and well-documented history of failing to protect students from abuse. Unfortunately, this case is just the latest chapter in that story.

2.      I.P. is a seventeen-year-old student at Martin Luther King High School. She is a talented vocalist and actress. She is a member of her high school's girls' volleyball team. She also suffers from an anxiety disorder. The District is aware of this because, prior to the events described in this Complaint, I.P. applied for and received a plan to address it pursuant to Section 504 of the Rehabilitation Act of 1973.

3.      For two years, I.P. endured bullying at the hands of her volleyball teammates. They openly mocked her at games and practices. They taunted her with comments that no one on the team likes her. They excluded her from team events. They interrogated her for not participating in mandatory denominational prayers before games. They did everything in their power to make her feel unwelcome, unworthy, and small. Yet, for years, I.P. sat by while the adults who were supposed to protect her — the coach, athletics department, and principal — watched her being bullied and did nothing.

4.      Responsible educators now understand that bullying like this is a serious problem – particularly for students suffering from anxiety. Organizations like the Trevor Project have done incredible work to raise awareness that it can lead to depression, self-harm, or worse. Responsible educators understand that they should be encouraging victims of bullying to use their *words* — especially in private exchanges with family and friends — to speak up against bullying rather than bottling up feelings of anger, frustration, hurt, or hopelessness.

---

[1]   Pursuant to Federal Rule of Civil Procedure 5.2 and L.R. 5.2-1, the Complaint includes only Plaintiff's initials to protect her privacy as a minor.

1

5.      Sadly, the adults in positions of authority at the District who were supposed to protect and help I.P. not only failed to do so, but *victimized her themselves* by punishing her attempt to speak out against bullying in her private Instagram messages to her close circle of friends.

6.      Defendants' behavior is reprehensible under any standard. It also clearly violated I.P.'s rights under the First and Fourteenth Amendments to the U.S. Constitution. Those violations are the impetus of this action.

## JURISDICTION & VENUE

7.      This action seeks to vindicate the rights protected by the First and Fourteenth Amendments to the U.S. Constitution and is brought under 42 U.S.C. § 1983. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. § 1331 as well as jurisdiction over a civil rights action under 28 U.S.C. § 1343. This Court also has jurisdiction under 28 U.S.C. §§ 2201 and 2202 to declare the rights of the parties and to grant all further relief found necessary and proper.

8.      Venue is proper in the Central District of California pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because the Defendants reside in the Central District of California, are subject to personal jurisdiction there, and the events and omissions that gave rise to this action occurred within the Central District of California.

## PARTIES

9.      Plaintiff I.P. is a seventeen-year-old student at Martin Luther King High School (the "High School")[2] in the Riverside Unified School District (the "District"). I.P. lives with her parents and sister in Riverside, California. She is a member of the High School's girls' volleyball team.

10.      Jason Pack is I.P.'s father. Mr. Pack brings this action on behalf of his minor daughter, I.P.

11.      Defendant Riverside Unified School District is a school district organized

---

[2]   While the namesake of the school is civil rights leader Martin Luther King Jr., the official name of the school is Martin Luther King High School.

and existing under the laws of the State of California. It is the 16th largest district in the state and is responsible for over 40,000 students at 47 public schools in its K-12 program. Among them is Martin Luther King High School.

12.     Defendant Michael West is the Principal of the High School. He resides in this District. West is a defendant in his individual and official capacities.

13.     Defendant Getty George is the Assistant Principal (Athletics), also known as the Athletic Director, of the High School. He resides in this District. George is a defendant in his individual and official capacities.

14.     Defendant Corey Kleven is the coach of the High School girls' volleyball team. He resides in this District. Kleven is a defendant in his individual and official capacities.

## FACTS

**A.     The District Has a Long History of Failing to Protect Children.**

15.     It is well known within Riverside that the District and High School have systemic problems protecting children of all ages from bullying and other forms of abuse.

16.     GreatSchools.org collects reviews from current students, parents, and others about their experience with schools nationwide. Among the experiences reported about Martin Luther King High School are:

- "Every year we get some type of threat to harm students at the school. The school lacks the ability to deal with any instances of bullying or an aggravated student. The atmosphere is full of negativity and unspoken racial tension . . . They terribly react to all instances of bullying and even turn a blind eye. I know quite a few kids who gave up trying to work with the school and left the school." (May 10, 2021)

- "The students at this school are not only racist, but homophobic, transphobic, and just overall horrible people, to say the least . . . Another thing is the number of people that get harassed for no reason either for the

3

way they dress or because of their race. Overall this school is a horrible place to go." (March 5, 2022)

- "This is the worst school for racism and if you have a special needs student on top of that . . . This school is the worst in Riverside." (August 9, 2021)

17.     The comment about threats from bullied students is well-supported by the record. Just over the past three years, multiple students at high schools in the District have been arrested for making threats against their school, including bomb threats.

18.     In 2020, a photo posted online went viral that depicted eight students at the High School posing with a swastika and confederate flag while making white supremacist hand gestures. Defendant-Principal West's official statement in response was that "[a]t this time in our country, the frank reality is that political and social views are strongly held by individuals," and that "[i]ndividual views, while people are entitled to them, may be in direct conflict with those of others, our school, and our district values."

19.     Later that same year, a video posted online went viral depicting a crowd of students at one of the neighboring middle schools chanting a racial slur against African Americans as a "call and response."

20.     Earlier this year the District paid $13.7 million to settle a lawsuit brought by 10 children who had been sexually abused at Liberty Elementary School. The suit alleged that District employees witnessed signs of abuse but failed to report it.

**B.     I.P. Is Bullied by Her Teammates.**

21.     I.P. is a seventeen-year-old student at the High School. She joined the High School's girls' volleyball team in 2021 and has been a member for two seasons.

22.     At 6'6" tall, I.P. could be an asset to the team at the middle blocker or opposite positions. Unfortunately, she also became a target for bullies on the team. They refused to warm up with her. They make her sit by herself on team bus rides. They would openly mock her at practices and games. They taunted her with comments that no one on the team likes her. They also interrogated her for not participating in

mandatory denominational prayers before games.

23.     Bullies on the team also made it a point to exclude I.P. from team events. Two such incidents are particularly relevant to the speech at issue in this case.

24.     One occurred on July 30, 2022. On that date, the High School brought in a photographer to take formal pictures of each of the team members. After pictures were taken, I.P. asked Defendant-Coach Kleven if the process of taking photos was over, because her younger sister had now finished her pictures as well. Kleven informed I.P. that no more pictures would be taken, so I.P. left to return home.

25.     When I.P. returned home that day, a group chat was sent to the entire varsity team, including I.P., attaching the "unofficial varsity volleyball team photo." In it, the team is posed in the traditional form of an official athletics team photo, with two rows of players lined up standing next to Coach Kleven (see Fig. 1). Kleven allowed the photo to take place without I.P. present, permitting the bullies to exclude I.P. from it. The photo has been blurred for purposes of this Complaint because some of the players may be minors.



**Fig. 1**. 7/30/2022 Photo Excluding I.P.

26.     Less than a week later, on August 5, 2022, I.P. attended an event at the

High School called Senior Sunrise. Senior Sunrise is an official event at the High School where seniors meet on the football field to watch the sunrise. This occurs on the Friday before the school year begins. The seniors on the varsity team, including I.P., received a group chat that morning noting that they intended to take a photo together to post to the team's Instagram account. I.P. waved to multiple team members at the event to let them know she was there. Yet, when it came time to take that photo, she was excluded again.

27.    I.P. learned that she had been excluded when she received the photo in the group chat later that day. The photo was also posted to the team's public Instagram account, @kingladywolvesvball (see Fig. 2). The account describes itself as the "Official Instagram of King High School's Volleyball Team."



**Fig. 2.** 8/5/2022 Photo Excluding I.P.

28.    One of the volleyball players who appears in the photo, and was

6

1   implicated in the bullying, was Defendant-Principal West's daughter. The photo has

2   been blurred for purposes of this Complaint because some of the players may be

3   minors.

4        **C.    I.P. Complains About the Bullying in Private Instagram Posts.**

5        29.    I.P. has a private Instagram account. With a private account, only friends

6   and family who make a request to follow her, and that she approves, can view her

7   posts. The posts are not publicly accessible.

8        30.    Instagram has a feature called "Stories" that allows users to post photos

9   with additional embellishments like text, audio, animations, and so forth. As with all

10  posts on a private account, these story posts appear only to friends who asked for and

11  received approval to follow the user. They are not publicly accessible. Story posts

12  disappear automatically after 24 hours. They can also be taken down by the user

13  before the 24-hour period expires.

14       31.    Instagram also has a feature that allows for posts to go to an *even more*

15  limited audience of Close Friends that the user selects from their approved followers.

16  If a post is made to Close Friends, only the limited subset of followers who the user

17  selects to be Close Friends can see the post. At the time of the stories noted below, I.P.

18  had selected approximately **twenty (20) people** to be her Close Friends. None of her

19  High School volleyball teammates were I.P.'s Close Friends, and thus they could not

20  view any of her Close Friends posts.

21       32.    I.P. saw the second team photo (from which she had been excluded) on

22  the afternoon of August 5, 2022, outside of school hours. She was at home with her

23  parents and sister at the time. Accordingly, Defendants had nothing even remotely

24  approximating *in loco parentis*.

25       33.    When she saw the photo, I.P. posted two stories to the Close Friends on

26  her private Instagram account using her personal cellphone, one right after the other.

27       34.    One post consisted of text written over an obscured image that said "I'm

28  so fucking pissed. This is the second time I've purposefully been excluded from

7

photos this year alone because the girls don't like me. PUT YOUR GOD DAMN EGO ASIDE AND GET OVER YOURSEL[VES]. WE ARE ON A TEAM. VARSITY AT THAT! BE FUCKING ADULTS[.] THEY['RE] ACTING LIKE FRESHM[EN] [FOR REAL, FOR REAL]. [I DON'T GIVE A FUCK] IF YOU DON'T LIKE ME. I'M ON YOUR TEAM [AND] I DESERVE TO BE HERE. And they['re] just fucking mad I have a chance of playing volleyball in college [♥]."



**Fig. 3**: 8/5/2022 Private Post on Instagram #1

35.    In the other post, I.P. clipped the team photo that she had been excluded from and added a caption that said "Fuck khs volleyball." The faces of the players have been blurred in this Complaint because some of the players may be minors.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Fig. 4**: 8/5/2022 Private Post on Instagram #2

36.     This is not meaningfully different, for First Amendment purposes, from I.P. complaining about bullying to a group of 20 close friends and family gathered at her home on a weekend. Or sending a private e-mail to 20 close friends and family.

**D.     I.P. is Suspended for Her Private Instagram Posts Without Any Notice or Opportunity to Respond.**

37.     The following Monday, August 8th, Defendant-Coach Kleven called I.P.'s parents and stated that Defendant-Principal West had obtained copies of the Instagram posts. Kleven further stated that West had then called Defendant-Athletic Director Getty, and that West and Getty subsequently called Kleven together to

9

communicate to him that I.P. would be suspended from the team for two weeks because of her private Instagram posts.

38.     During that call, Kleven expressed to I.P.'s parents that he would have preferred that I.P. not be suspended, and to instead handle the matter internally within the team, but that Defendants West and George had instructed him that I.P. would be suspended.

39.     Kleven claimed that Defendants were acting pursuant to the District's athletics policies, which the District later clarified were the PEAK Guidelines.

40.     Shortly after speaking with I.P.'s parents, Kleven called I.P. to inform her that she would be suspended. During that call, Kleven admitted that he was aware that I.P.'s teammates were often mean to her and that they did so to "get a rise out of her."

41.     I.P. was not given any notice, or any opportunity to respond, prior to being told that she would be suspended from the team. Accordingly, I.P. was not afforded anything even remotely resembling due process before being punished.

42.     That lack of due process was compounded because Defendant-Principal West's involvement in suspending I.P. was an obvious conflict of interest: I.P. was complaining about bullying that West's own daughter was implicated in. West's daughter also plays the same position as I.P., and received more playing time as a result of I.P.'s suspension.

**E.     Defendant West Refuses to Reverse I.P.'s Suspension and Attempts to Hide His Actions from the District.**

43.     After I.P. was told she would be suspended, I.P.'s parents first appealed to Defendant-Principal West directly to reverse it. On August 15, 2022, they sent a letter to West raising serious questions about I.P.'s suspension. Among other things, the letter noted that the posts were made to her Close Friends on I.P.'s private Instagram account, and were in response to her frustrations about being bullied by her teammates. It also noted the failure to afford I.P. any notice or opportunity to respond.

44.     In the cover e-mail, I.P.'s father also stated to West that "given your

involvement and potential conflict of interest in this matter, as noted in our request, we would like to have someone from the Superintendent's office also included in the response."

45.     Two days later, on August 17, 2022, West responded by requesting a meeting that Friday. West's response referred to I.P. by the wrong name and requested "an initial opportunity to meet with you **without district representation present**" (emphasis added).

46.     I.P.'s father responded with concern about West's attempt to evade the District's involvement given West's conflict of interest in the matter, and asked that representatives from the District be present at the meeting. He also asked that I.P. be immediately reinstated.

47.     West responded by denying I.P.'s request to be reinstated. He offered to involve Sean Curtin, who West claimed "oversees athletics at the district." I.P.'s father responded that the District's Title IX coordinator would be the more appropriate choice and copied him into the correspondence.

48.     In response to Mr. Pack's request, the District scheduled a meeting with I.P.'s parents and the District's Title IX coordinator, Raul Ayala, for August 22, 2022. Ayala included Curtin in the meeting as well.

49.     The same day the meeting was scheduled, I.P. received a hang up call from an unknown number. After the caller hung up, I.P. received a text message from the number that said "Ugly ass." Mr. Pack forwarded a picture of that text message to Ayala by e-mail the same day.

**F.    I.P.'s Parents Meet with the District and Are Assured That Their Questions and Concerns Would Be Addressed.**

50.     On August 22, 2022, I.P.'s parents met with Ayala and Curtin from the District.

51.     At that meeting, I.P.'s parents reiterated the points made in their August 15, 2022 letter to West, including that I.P. had been suspended without notice or an

opportunity to be heard, and that she had been punished for speech in her private Instagram account, outside of school hours, made to Close Friends, that was complaining about bullying.

52.     During that meeting, Ayala admitted that I.P.'s private Instagram posts were protected speech.

53.     At that meeting, Ayala also informed I.P.'s parents that they had a choice under the District's regulations: they could either file an informal complaint using the District's form, and receive a response within thirty (30) days, or they could file a formal complaint under the District's uniform complaint procedures, which would not guarantee a thirty-day timeframe for a response.

54.     I.P.'s parents asked Ayala if all of their concerns would be addressed, and if all of the questions they posed in their August 15, 2022 letter would be answered, if they chose to use the form that guaranteed a 30 day response. They were assured, repeatedly, that their concerns would be addressed, and answers would be received.

55.     Accordingly, the same day, I.P.'s parents filed a complaint using the form that the District provided to them. At the top of the form, it says in bold "Report will be investigated no later than the end of the next school day and report of the outcome to parent within 30 days." The complaint provided the same details that were reported to Defendant-Principal West on August 15, 2022, including how I.P. had been mistreated, the context for her private speech, and the failure to afford her notice or an opportunity to respond.

56.     The District confirmed receipt of the complaint that day, and noted that they would be assigning an assistant principal from another school to investigate.

57.     Two days later, Mr. Pack emailed Ayala to supplement the complaint with additional facts: I.P. continued to be bullied in the same manner, even after re-joining the team from her suspension, and Defendants were doing nothing to address it. He received no response to that e-mail.

58.     That day, Mr. Pack also sent Mr. Ayala a bulletin prepared for another school district in California about the Supreme Court's 2021 decision in *Mahanoy v. B.L.,* which addressed the First Amendment rights of students using their private social media accounts to complain about school athletics. He received no response to that e-mail either.

59.     Very shortly after I.P.'s parents filed their complaint with the District, Defendant-Principal West suddenly went on leave and was temporarily replaced by Interim Principal Coleman Kells. Students and parents were told that West was going on temporary medical leave.

60.     Interim Principal Kells later stated to I.P.'s parents that he viewed I.P.'s posts as a cry for help.

**G.     The District Ignores I.P's Complaint About The Violation of Her Constitutional Rights.**

61.     On September 23, 2022 ─ two days late under the District's own regulations ─ Ayala sent a three-page letter to I.P.'s parents, which constituted the District's formal response to their complaint.

62.     The letter contended that the District had conducted an investigation that included interviewing I.P., her teammates, Defendant-Coach Kleven, Defendant-Athletic Director George and other unnamed "school officials." The letter proceeded to describe some of the ways in which I.P. had been mistreated by her teammates recently and concluded that the District did not believe it was serious enough to qualify as bullying under their definition.

63.     At no point did the letter even address, let alone refute, that I.P.'s rights to freedom of speech or due process had been violated.

64.     The letter simply contended that I.P. had been suspended because her private Instagram posts purportedly violated the District's PEAK Guidelines, while admitting that "the investigation revealed that [I.P] was **not informed of how she violated the Athletics Policy and not given an opportunity to respond**, prior to a

13

determination that she would be suspended from the team for two weeks" (emphasis added).

65.   Very shortly after I.P.'s parents received the District's letter, Defendant-Principal West curiously returned from his temporary leave.

**H.   Defendants Refuse to Meaningfully Remediate Their Constitutional Violations.**

66.   After receiving the District's report, I.P.'s parents, through counsel, sent the District a letter on September 26, 2022 noting that the District had failed to address the violation of I.P.'s Constitutional rights as they had promised to do, including the violations of her First Amendment right to freedom of speech and Fourteenth Amendment right to due process.

67.   As of the filing of this complaint, Defendants West, George and Kleven all remain in their positions. They have not been terminated, demoted, or have faced any meaningful consequences for their actions. The PEAK Guidelines remain in place. Neither I.P. nor her parents have received any compensation from Defendants for their violation of her rights.

68.   Accordingly, I.P. and her parents had no choice but to file this lawsuit to remedy Defendants' violation of her constitutional rights and ensure that other students are not similarly victimized in the future.

**I.   Defendants Have a History of Suppressing Private Speech Without Warning.**

69.   I.P.'s case is not the only recent instance of the High School suppressing student speech that involves Defendant-Principal West's daughter.

70.   Last school year, a then-senior at the High School who was a member of the Associated Student Body ("ASB") posted to her social media account her belief that not all members of the ASB were working as hard as they should be, and that those who were working hard were not receiving sufficient recognition for their efforts. West's daughter was a member of the ASB at the time.

71.     Shortly after making the post, that student was informed that she was being suspended from the ASB for two weeks ─ without any notice or opportunity to respond.

**J.     The PEAK Guidelines**

72.     The PEAK Guidelines are posted on the High School's athletics website, www.kingwolvesathletics.com, and are attached to this complaint as **Exhibit A**. The site claims that these guidelines are "about using athletics at the high school level and within the context of an educational institution to teach whole-life principles and lessons to the student-athletes who participate in sports at [the High School]."

73.     However, the Guidelines are hopelessly vague and overly broad ─ particularly when applied to speech. Among them are the following provisions:

- "Demonstrate character and class with both words and actions that display professionalism. Choose language that promotes building esteem and not the destruction of spirit." (Guideline #1)
- "Be aware of team dynamics in the use of social media. It can unite and it can destroy." (Guideline #6)
- "Keep the proper perspective[.]" (Guideline #2)
- "A positive attitude is critical to the athlete, the team and the coaching staff." (Guideline #3)

74.     No guidance is provided whatsoever as to what the District will deem to be speech that is "classy" or "promotes building esteem and not the destruction of the spirit." Or what speech on social media platforms will "destroy." Or what speech they will deem to be lacking in a "positive attitude."

75.     This leaves District employees like Defendants West, George and Kleven with unfettered discretion to punish any speech from a student-athlete with which they disagree – even core political speech.

**K.     I.P. Faces Ongoing Harm from Defendants' Actions.**

76.     Volleyball is I.P.'s main extracurricular activity, and she has devoted

15

considerable time and energy to her development as a player. I.P. is also a senior who is in the process of applying to college. She is seeking to play volleyball at the collegiate level and hopes to receive an athletic scholarship to do so.

77.     Being suspended from the team harmed I.P.'s development as a player and denied her playing time in her critical senior year. It may also impair her ability to gain admission to her college of choice or receive an athletic scholarship.

78.     Defendants' scheme also succeeded in that Defendant-Principal West's daughter received more playing time on the team during and after I.P.'s suspension at I.P.'s expense.

79.     Defendants' actions have also caused I.P. significant emotional turmoil. She is rightfully devastated that adults who were supposed to protect her from bullying instead violated her rights and continue to do so. The suspension and fallout from Defendants' actions have contributed to depression and have exacerbated her serious, pre-existing anxiety disorder, of which the District was aware. She is actively seeking therapy to cope with this fallout from Defendants' actions.

80.     Defendants' actions have also chilled I.P.'s desire to speak up against bullying, or other forms of abuse, for fear of being further victimized for doing so.

## CLAMS FOR RELIEF

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983: Freedom of Speech - Violation of First Amendment

81.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 80 of this Complaint.

82.     Defendants were acting under color of state law in their actions and omissions alleged in this Complaint.

83.     Defendants' conduct, as alleged in detail in this Complaint, deprived I.P. or her right to freedom of speech under the First Amendment, as applied against the states by the Fourteenth Amendment, in at least the following ways:

- Defendants suspended I.P. from the High School girls' volleyball team

for her private Instagram posts, made outside of school hours, while in her home, to her Close Friends, complaining about being bullied by her teammates.

- The District's PEAK Guidelines are unconstitutionally overbroad on their face, particularly as applied to speech. This overbreadth has a chilling effect on student speech.

- The District's PEAK Guidelines are also overbroad as applied to I.P.'s speech, which is a private Instagram post, made outside of school hours, in her home, to Close Friends, complaining about bullying by her teammates.

- The District's PEAK Guidelines are void for vagueness. They fail to provide any reasonable measure of notice to student-athletes as to what will constitute permissible speech. The imprecise language encourages arbitrary enforcement by allowing the District's employees unfettered discretion to punish speech with which they disagree.

84.    The District delegated to the other Defendants the authority to suspend a student-athlete and to make policy in that regard at the High School. Defendants purported to be acting pursuant to District policy and custom.

85.    The District also ratified the actions of the other Defendants when those actions were reported to the District.

86.    The District also failed to properly train, hire, and/or supervise the other Defendants regarding the proper procedures and limitations on student discipline, including the need to protect students' First Amendment rights. The District was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of the First Amendment by its employees, and to the known or obvious consequences of its failure to train its employees adequately.

87.    A direct causal link exists between Defendants' actions and the injuries alleged.

88.    Plaintiff is and continues to be damaged by Defendants' violation of her First Amendment rights as alleged in this Complaint. She has suffered economic and emotional injuries in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983: Due Process - Violation of Fourteenth Amendment

89.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 88 of this Complaint.

90.    Defendants were acting under color of state law in their actions and omissions alleged in this Complaint.

91.    Defendants' conduct, as alleged in detail in this Complaint, deprived I.P. of her right to due process under the Fourteenth Amendment by suspending I.P. from the High School girls' volleyball team for her private Instagram posts. Defendants failed to provide I.P. with any notice or opportunity to respond before suspending her from the team.

92.    Defendants also failed to afford I.P. due process because the suspension was influenced by Defendant-Principal West, who had an obvious conflict of interest.

93.    The District delegated to the other Defendants the authority to suspend a student-athlete and to make policy in that regard at the High School. Defendants purported to be acting pursuant to District policy and custom.

94.    The District also ratified the actions of the other Defendants when those actions were reported to the District.

95.    The District also failed to properly train, hire, and/or supervise the other Defendants regarding the proper procedures and limitations on student discipline, including the need to protect students' Fourteenth Amendment rights. The District was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of the Fourteenth Amendment by its employees, and to the known or obvious consequences of its failure to train its employees adequately.

96.    A direct causal link exists between Defendants' actions and the injuries

18

1    alleged.

2        97.    Plaintiff is and continues to be damaged by Defendants' violation of her

3    Fourteenth Amendment rights as alleged in this Complaint. She has suffered

4    economic and emotional injuries in an amount to be proven at trial.

5    **PRAYER FOR RELIEF**

6        WHEREFORE, Plaintiff prays that the Court enter the following relief:

7         1.   Declare that Defendants' disciplinary action against I.P. for her out-of-

8             school speech violated I.P's rights under the First Amendment to the

9             Constitution, as applied to the states by the Fourteenth Amendment.

10        2.   Declare that Defendants' disciplinary action against I.P. violated her due

11            process rights under the Fourteenth Amendment to the U.S. Constitution.

12        3.   Declare that the PEAK Guidelines that have been used, and may be used,

13            by the District to punish speech violate the First and Fourteenth

14            Amendments to the U.S. Constitution because they are unconstitutionally

15            vague.

16        4.   Declare that the PEAK Guidelines, on their face, violate the First and

17            Fourteenth Amendments to the U.S. Constitution because they are

18            overbroad.

19        5.   Enjoin Defendants from any continuing punishment or sanction against

20            I.P. for her constitutionally protected speech.

21        6.   Award Plaintiff compensatory damages in an amount to be determined at

22            trial.

23        7.   Award Plaintiff punitive damages.

24        8.   Award Plaintiff costs and reasonable attorneys' fees.

25        9.   Grant such other and further relief as the Court deems just, appropriate,

26            and equitable.

27   **DEMAND FOR JURY TRIAL**

28       Plaintiff hereby requests a trial by jury as to all issues so triable.

DATED:  October 31, 2022

Respectfully submitted,

**JONATHAN J. FARIA P.C.**

_/s/ Jonathan J. Faria_

Jonathan J. Faria (SBN 274019)
jon@fariapc.com

Attorney for Plaintiff

# EXHIBIT A




## PROMOTING EDUCATIONAL ATHLETICS at KING

















**TOGETHER Keeping the Bar Raised at the P.E.A.K.**

**P**

1. **PROFESSIONAL** — Demonstrate character and class with <u>both</u> words and actions that display professionalism.  Choose language that promotes building esteem and not the destruction of spirit.  Consistently foster strong work ethic, recognize remarkable performance and display the highest qualities of sportsmanship.

2. **PERSPECTIVE** - Keep the proper perspective:  participating in high school sports is not a graduation requirement nor for the purpose of earning a collegiate scholarship, rather a privilege to represent your school in sport.  It provides daily opportunity to practice the life skills of managing time, working with personalities, coping with emotional highs and lows of sport and allowing fun along the way.

Initial

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

**E**

3. **ENCOURAGE** - Being a part of King Athletics is already a huge accomplishment.  A positive attitude is critical to the athlete, the team and the coaching staff.   Encourage by complimenting things done well and motivate by helping to set attainable goals for improvement.   Provide opportunities for success through timely preparation and positive reinforcement.

4. **ENTIRETY** -  The concept of "TEAM" and the unique memory each year creates begins with the understanding that there is no "I" in TEAM.  The second you make it all about the individual, is the second you've already lost focus about TEAM first.    Stay committed to "we" not "me."  This includes ALL areas of TEAM, not just playing time.  Promote:  it's not what the TEAM can do for me, it's what I can do for the TEAM.

Initial

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

**A**

5. **ACADEMICS** - The focus on academics through work ethic in the classroom translates to work ethic in sport.  CIF has reported that only 1% of all senior athletes nationwide receive a Division I scholarship, and the average amount is $8000 per year.  Therefore, our primary focus at King is academics.  Be pro-active by checking grades daily/weekly on Aries.   Manage time that will balance academics and athletics, and not put you in a position that will affect grades or affect the TEAM.

6. **AWARENESS** - Be aware of team dynamics in the use of social media.   It can unite and it can destroy.   Continue to advise/protect the team from critical mistakes.   Hold each other accountable.

Initial

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

**K**

7. **KNOW** - and follow the chain of command:  **Step 1** - Player to Coach.  Meetings of this nature suggest the presence of a team captain and an assistant coach;  **Step 2** - Player/Parent to Coach.  Due to emotions involved, the time to address a concern is after practice, not after a game;  **Step 3** - Player/Parent/Coach to Athletic Director.  This step will not be considered if Steps 1 and 2 have not taken place.   Remember that coaching decisions will be based on the TEAM (see Point 4).

8. **KING** - team athletic rules are expected to be followed.  Monitor health habits that provide proper nutrition, adequate water intake, absence of alcohol/drugs/steroids and maintain curfew rules.  Wearing a King uniform represents all the high standards of those who have worn the name before you and carries the tradition of excellence.   Embrace the opportunity to add your mark to King High School Athletics.

Initial




**PROMOTING EDUCATIONAL ATHLETICS at KING**

















**TOGETHER,** we have read and discussed the P.E.A.K. Points and agree to support the integrity of King High School Athletics.  **The signature of the athlete confirms:  1)**  His/her Coach went over the P.E.A.K. Points with the athlete and the parent;  **2)**  The Parent has initialed (4x) on page one and will keep a copy for records;  and **3)**  The Athlete has shown page one with parent initials to the coach and agrees to work TOGETHER to maintain  the P.E.A.K. expectations and standards.

**P**

**E**

**A**

**K**

| | | | |
|---|---|---|---|
| 1 | | 21 | |
| 2 | | 22 | |
| 3 | | 23 | |
| 4 | | 24 | |
| 5 | | 25 | |
| 6 | | 26 | |
| 7 | | 27 | |
| 8 | | 28 | |
| 9 | | 29 | |
| 10 | | 30 | |
| 11 | | 31 | |
| 12 | | 32 | |
| 13 | | 33 | |
| 14 | | 34 | |
| 15 | | 35 | |
| 16 | | 36 | |
| 17 | | 37 | |
| 18 | | 38 | |
| 19 | | 39 | |
| 20 | | 40 | |